Joe Tuffaha (SBN 253723)
    jtuffaha@tc-llp.com
Prashanth Chennakesavan (SBN 284022)
    pchennakesavan@tc-llp.com
Rajesh Mandlekar (SBN 196797)
    rmandlekar@tc-llp.com
Omar Tuffaha (SBN 355469)
    otuffaha@tc-llp.com
**Tuffaha Chennakesavan**
  **Mandlekar LLP**
515 S. Flower St., 18th Fl.
Los Angeles, CA  90071
Tel.: (213) 449-5230

*Counsel for Plaintiffs Julius Lipp and
Julius Lipp Holding, UG*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIUS LIPP, an individual; and JULIUS LIPP HOLDING, UG, a German limited liability company, | Case No. |
| Plaintiffs, | **COMPLAINT FOR:**<br>1. **BREACH OF CONTRACT** |
| vs. | 2. **BREACH OF CONTRACT**<br>3. **CONVERSION** |
| MIXEDBREAD AI, INC., a Delaware corporation, | 4. **VIOLATION OF CALIFORNIA PENAL CODE § 496**<br>5. **DECLARATORY JUDGMENT** |
| Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiffs Julius Lipp and Julius Lipp Holding, UG (together, "Plaintiffs"), hereby assert the following claims against defendant Mixedbread AI, Inc.

**THE PARTIES**

1. Plaintiff Julius Lipp ("Lipp") is a citizen of Germany who is not lawfully admitted for permanent residence in the United States. Lipp is lawfully present in the United States pursuant to a non-resident Visa. Lipp is the sole owner of plaintiff Julius Lipp Holding, UG, and acts as its Manager.

2. Plaintiff Julius Lipp Holding, UG ("Lipp Holding"), is a German Limited liability Company (haftungsbeschränkt). Lipp Holding is the rightful owner of four million five hundred thousand (4,500,000) shares of the common stock of Defendant Mixedbread AI, Inc.

3. Defendant Mixedbread AI, Inc. ("Mixedbread" or the "Company"), is a Delaware corporation with its principal place of business located at 1550 Parkside Drive, Suite 130, Walnut Creek, CA 94596.

**JURISDICTION AND VENUE**

4. Jurisdiction is proper in this Court because complete diversity exists pursuant to 28 U.S.C. § 1332(a)(2). Plaintiffs Lipp and Lipp Holding are both subjects of a foreign state, and defendant Mixedbread is a citizen of both California and Delaware. The amount in controversy exceeds $75,000.00, as discussed below.

5. The claims asserted herein arose in this judicial district and defendant Mixedbread resides and does business in this judicial district. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) as defendant Mixedbread is a resident of California and resides in this judicial district. Venue in this judicial district also is proper under 28 U.S.C. § 1391(b)(2) in that this is the judicial district in which a substantial part of the acts and omissions giving rise to the claims occurred.

**FACTS RELEVANT TO ALL CLAIMS**

6. Plaintiff Lipp is a software engineer and product-focused technology leader with experience in backend/distributed systems, Artificial Intelligence ("AI"), information retrieval, and full-stack product development. Before co-founding Mixedbread, Lipp held multiple software

engineering roles, including at Google and PPI AG, where he managed teams and built production systems serving enterprises across banking and insurance sectors.

7.     In addition to his employment, Lipp demonstrated his ability to conceive and ship independent products, including ai-engineering work on AdmissionHacks and building Wordgenie. Prior to Mixedbread, Lipp also built Embaas, an embeddings-as-a-service platform that later evolved into what would become Mixedbread.

8.     Given his technical expertise in AI and software engineering, proven performance at leading technology companies and entrepreneurial track record, Lipp had multiple career paths available to him—including continued employment at established companies like Google or pursuing consulting opportunities in the rapidly growing AI sector.  Instead, Lipp chose to forgo these other opportunities to co-found Mixedbread, believing that his equity stake and role as a co-founder would be protected.

9.     Mixedbread was incorporated on or around October 27, 2023.  The Company was the joint creation of its two co-founders:  Lipp, and Aamir Shakir ("Shakir").  By incorporator resolution dated October 26, 2023, Lipp and Shakir were appointed as Mixedbread's two Directors.  Also around this time, Shakir was elected as Mixedbread's Chief Executive Officer ("CEO"), while Lipp was elected as its Chief Technology Officer ("CTO").[1]

10.     The business of Mixedbread is the engineering of sophisticated methods of data search utilizing artificial intelligence (a/k/a "AI").  As provided by the Company's current website:

> **Retrieving the right context.**  Mixedbread is an applied research lab fundamentally rethinking retrieval.  Our mission is to build the memory for AI, ensuring intelligent systems have perfect context to understand the world and interact with it in meaningful ways.
>
> Context is the bottleneck.  An AI without access to the right information, at the right time, is fundamentally limited.  We are building the essential link between the vast universe of human knowledge, from scientific papers and creative works to real-world video and audio, and the AI systems that need this context to become truly intelligent.

---

[1] At the time of Mixedbread's founding, both Lipp and Shakir were residing in Germany.  Roughly contemporaneous with the founding of Mixedbread in the US, the two also formed a German entity, mischbrot ki GmbH ("mischbrot").

An AI with this perfect context will accelerate discovery, enhance creativity, and solve complex problems with factual accuracy.  It will move beyond the limitations of its training data, operating with perfect recall and a deep understanding of the information it's given.

We are a focused team of researchers and engineers building a single, unified engine that makes the old way obsolete.  Our work is at the intersection of deep learning research and high-performance systems engineering.  Our open-source models have already been downloaded over 50 million times, becoming a foundational tool for developers and validating our unique approach.

https://www.mixedbread.com/careers

11.    From its inception, Lipp and Lipp Holding have been integral to the Company's formation, ongoing operation, present success and future potential.  As Co-Founder and CTO of Mixedbread, Lipp conceived, architected, and built the company's technology and product from scratch, including:

- A unified retrieval engine capable of understanding and searching any type of unstructured information (text, images, documents, …) across multiple languages;

- The core services and scalable infrastructure enabling data processing, organization, and instant retrieval at enterprise scale;

- A complete platform with customer-facing APIs, software development kits (SDKs), billing systems, documentation, and developer tools;

- Discovery of novel technical breakthroughs, including a new quantization method for embeddings that made the entire approach commercially viable;

- Technical architecture decisions that enabled handling millions of requests while maintaining cost efficiency;

- Product strategy and day-to-day execution, translating product & technical vision into a working platform that attracted major technology companies; and

- Engineering team leadership, code reviews, and establishment of development practices and standards.

12.    Lipp  originated the central vision for Mixedbread: an AI-powered retrieval system that would serve as the foundation for how companies and AI applications access and understand

unstructured information—regardless of format or language—through a single, unified engine.  He proposed the concept, defined the architecture, and implemented the core system that transformed this vision into reality.

13.    In contrast to Lipp's accomplishments for Mixedbread, early on the Company was stagnating under the anemic leadership of Shakir.  Shakir quickly proved incapable of executing on any vision for Mixedbread.  Employee morale sagged.  Through much of 2024, Mixedbread experienced leadership drift, with no shippable product and a lack of coherent direction.

14.    At the end of 2024, Lipp himself took decisive action to remedy the situation—pushing for Mixedbread's main product, and beginning the buildout of the system—moving the company from concept to execution.  Acting as principal architect and builder, Lipp transformed the company from concept into execution by creating a full enterprise-grade SaaS platform.  He built the product end-to-end—from backend systems to customer-facing interfaces and developer tools—and established the foundation for scale by driving an execution-first cadence that converted ideas into working software and tangible demos.

15.    As Mixedbread's product began working in early 2025, the team rallied around it and employee enthusiasm rose.  Team members, including Shakir, heaped praise on Lipp for his engineering, product vision and leadership during this critical period.  Shakir, who had initially questioned some of Lipp's technical approaches, became a strong advocate for the product direction once it demonstrated clear success.

16.    Shakir admitted during this time that he himself had made virtually no material contributions to this budding success of Mixedbread.  Indeed, on April 2, 2025, Shakir messaged Lipp in German that "my performance is non-existent", "right now I'm more in the way than bringing anything of value" and "if I were our employee, I would fire myself."

17.    In recognition of Lipp's status as a co-founder of Mixedbread, on October 26, 2023, the Company executed a Restricted Stock Purchase Agreement with Lipp Holding, of which Lipp is the sole owner ("RSPA").[2]  Pursuant to the RSPA, Lipp Holding purchased four million five

---

[2] A copy of the RSPA is attached hereto as Exhibit A.

hundred thousand (4,500,000) shares of the Company's common stock.  RSPA ¶ 1.

18.    The RSPA contains a repurchase option ("Repurchase Option") for the Company. *See* RSPA ¶ 3.(a).  This Repurchase Option, however, is sharply limited by a vesting schedule also contained in the RSPA ("Vesting Schedule"), which functions to release shares from the ambit of the Repurchase Option on a rolling basis.  *See* RSPA ¶ 3.(a).  Pursuant to the Vesting Schedule, as of the date of the filing of this Complaint, approximately 56% of the 4.5 million shares (2,531,250) purchased by Lipp Holding have vested—and thus are not subject to the Repurchase Option.  *See id*.

19.    And while, under the RSPA, this rolling release from the Repurchase Option ceases as to unvested shares upon the date of "termination of [the] Purchaser's status as a Service Provider" (RSPA ¶ 3.(a)(iii)), such "termination" can have no application to Lipp Holding.  This is because, under the explicit terms of the RSPA, Lipp Holding is deemed to be a "Service Provider" based on either the *past* or *present* rendition of services to the Company:  "'Service Provider' means any person or entity, including an advisor, who *renders*, or *has* *rendered*, services to the Company."  RSPA ¶ 3.(a)(iii) (emphasis added).  As discussed above, Mixedbread's core technological infrastructure was originally built on—and continues to this day to run on—engineering provided by Lipp Holding.  Thus, it will *always* be the case that Lipp Holding "has rendered" services to the Company, and it further continues to "render[]" them on an ongoing basis, within the meaning of RSPA ¶ 3.(a)(iii).  As such, Lipp Holding will forever be a "Service Provider" not subject to termination under the RSPA.  The ongoing release of Lipp Holdings' shares from the Repurchase Option continues apace—unimpeded by whatever actions Mixedbread may take.

20.    On or around August 8, 2024, Lipp and Shakir, acting as Mixedbread's Board of Directors, authorized the Company to enter into a Series Seed Purchase Agreement (the "SSPA"). Pursuant to the SSPA, Max Claussen ("Claussen") was added to Mixedbread's Board as a non-executive Director, with Lipp and Shakir remaining as the Board's executive Directors.

21.    In mid-2025, Mixedbread resolved that Lipp should relocate from Germany to San Francisco, recognizing that his excellent work had attracted significant customer interest in the Bay

Area and that the Company's main customers were located there.  Lipp relocated to San Francisco as requested, and Mixedbread subsequently determined that the Company's engineering team— which reported to Lipp—should also relocate to San Francisco to work alongside him, with plans to eventually relocate the entire company to San Francisco.

22.    Roughly contemporaneous with Lipp's move to the US, he entered into an employment agreement with Mixedbread effective May 28, 2025 ("Employment Agreement" or "EA").[3]  The Employment Agreement provides for Lipp's paid employment with the Company as its Chief Technology Officer, specifying that he "shall be responsible for, among other things, developing and executing the Company's technology strategy, overseeing product development and IT operations and leading technical teams."  EA at ¶¶ 1-2 and Exhibit A.[4]  The Employment Agreement provides that Mixedbread may terminate Lipp only "for Cause."  EA at ¶ 3.  The Employment Agreement provides further that:

> "Cause" shall mean the occurrence of any of the following: (1) Employee's continuous failure to substantially perform Employee's duties hereunder; (2) Employee's theft, fraud, dishonesty or breach of fiduciary duty as relates to the Company's business or property; (3) Employee's material failure to abide by applicable codes of conduct or policies or engagement in moral turpitude or conduct which is materially injurious to the Company monetarily or otherwise.

*Id.*

23.    In his role as CTO, Lipp had always worked diligently to maximize Mixedbread's potential.  For example, he created and managed a hiring pipeline, personally interviewing high-profile U.S.-based candidates for critical business leadership roles and introducing them to Shakir for next-round interviews.  Lipp also pursued important enterprise prospects, and engaged in many other high-level efforts calculated to advance the Company's interests.  Along the way, Lipp received from Shakir nothing but high praise for his technical expertise and hard work for Mixedbread.

---

[3] A copy of the Employment Agreement is attached hereto as Exhibit B.

[4] While the EA provides Lipp with a salary of $100,000.00 per year (*see* EA at ¶ 2.1), the parties understood and agreed that this represented a rate of pay far below market, and accordingly that Mixedbread would significantly raise it later in 2025.

24.    Beginning in or around June of 2025, however, all of that changed.  At this time, Lipp became aware that Shakir and Claussen were engaging in a pattern of bad faith conduct designed to isolate and improperly oust Lipp from Mixedbread and steal his shares, in violation of Mixedbread's legal duties to him.

25.    For example, despite Lipp's vital role as CTO of Mixedbread and the main driver of its nascent success, Shakir began excluding Lipp from key responsibilities and communications. Shakir unilaterally reneged on his agreement to locate Lipp's engineering team to San Francisco with him.  Shakir also began to exclude Lipp from important customer conversations and slotted engineers in his place.  Shakir further hosted an offsite meeting with the full engineering team in Italy—but excluded Lipp—effectively isolating him from his own team.

26.    In early June 2025, Shakir ambushed Lipp and abruptly demanded that Lipp leave Mixedbread.  Lipp was shocked and completely taken off-guard.  Given Lipp's undisputed role as the one who took the lead in building the Company's core technology and transformed its product offering from stalled to dynamic, he could never have anticipated such a ruthless act of betrayal. Shakir's treachery was all the more startling to Lipp because Shakir was his co-founder and a person he had considered a friend.

27.    Neither Shakir or Mixedbread had any justification whatsoever for demanding Lipp's departure.  Instead, this was simply a brazen attempt by Shakir and the Company to steal the fruit of Plaintiffs' hard work and skill, in order to keep it for themselves.  Indeed, as a Mixedbread insider would privately confess to Julius around this time, Shakir and his cronies were operating under the premise that, now having obtained the benefit of Lipp's engineering skill and business ideas, "[Shakir] decided he doesn't need Julius [Lipp] anymore."

28.    Lipp struggled with how to respond to Shakir's demand that he leave the Company. As a recent immigrant to the US, Lipp was unsure of his rights, and fearful that, as CEO, Shakir could effectively manipulate Mixedbread to his advantage.  Attempting to salvage some benefit from his hard work for the Company, Lipp proposed to Shakir a variety of alternative scenarios. One such scenario included Lipp's formation of a new company called "The Company Company," which would collaborate with Mixedbread for the mutual benefit of the two companies.  Shakir did

not respond positively to any of Lipp's proposals.

29.    Shakir and Claussen then continued to pressure Lipp to leave Mixedbread.  As part of these illicit efforts, Shakir and Claussen even attempted to extort Lipp by threatening to have Mixedbread cause the revocation of his US immigration visa unless he voluntarily agreed to leave the Company.  At one point, during further discussions of how to possibly effect an amicable separation of Lipp from the Company, Lipp requested time to consult an attorney to advise him concerning the proposed terms.  Shakir and Claussen responded to this reasonable request by informing Lipp on June 29, 2025, that they were scheduling an immediate Board meeting.  They then hastily and unilaterally convened this Board meeting at approximately 11:45 p.m. on June 30, 2025, mere hours before another tranche of Lipp's equity was to be released from the Repurchase Option on July 1.  At the meeting, Shakir and Claussen purported to terminate Lipp's employment. In doing so, Shakir and Claussen admitted that the Company lacked the "Cause" required under the Employment Agreement (EA at ¶ 3) for a valid termination, and indeed wholly failed to identify any improper conduct attributable to Lipp.

30.    Further, at the meeting Shakir and Claussen stated outright that their motivation in terminating Lipp's employment was to stop the ongoing release of Lipp Holding's shares from the Repurchase Option.  The Mixedbread Board meeting minutes for this meeting provides in part that:

> It was discussed and found in the best interest of the Company that Julius Lipp's employment status with the Company be immediately terminated along with his status as a "Service Provider" under this restrictive stock purchase agreement. Accordingly, effective June 30, 2025, all vesting for Julius Lipp was ceased as a result of his termination as an employee and Service Provider.

31.    This assertion by Mixedbread's Board, however, is invalid for at least two reasons. First, the ongoing release of Lipp Holdings' shares from the Repurchase Option is not dependent on whether plaintiff Lipp, the individual, maintains a contract of employment with Mixedbread. Second, under the clear terms of the RSPA as described *supra* at ¶ 19, Lipp Holdings will forever be a "Service Provider" not subject to termination under the RSPA.

32.    On or about July of 2025, Plaintiffs retained counsel in order to protect their rights. On July 15, 2025, Plaintiffs' counsel sent a letter to Mixedbread that (1) summarized the wrongful

conduct taken by the Mixedbread, Shakir, and Claussen to remove Lipp from the Company and convert Lipp Holding's equity for their own benefit; and (2) demanded that such wrongful conduct cease and be rectified.

33.    On July 21, 2025, recognizing that Lipp's June 30 purported termination lacked the required cause, and thus was wholly improper and unlawful, Mixedbread (and its Board), through its Secretary and legal counsel Eric Benisek, in conclusory fashion, alleged that Lipp had himself decided to leave the Company to *compete* with it by forming The Company Company.  Of course, as Mixedbread knew, this was an absolute lie.  As alleged above, Lipp suggested the formation of The Company Company only *in response* to Shakir's insistence that Lipp leave Mixedbread, and Lipp identified for The Company Company a role whereby it would not compete—but collaborate—with Mixedbread.  Moreover, this justification was never presented at the June 30, 2025, meeting where the Board purported to terminate Mr. Lipp.  Recognizing that there absolutely was no cause to terminate Mr. Lipp at the June 30, 2025, Board meeting, Mr. Benisek (on behalf of Mixedbread and its Board) also attempted to manufacture a new reason to terminate Lipp.  Specifically, Mixedbread alleged that it had discovered, on July 8, 2025, that Lipp had published a code repository called DocuMark, which contained "mixedbread's trade secrets and intellectual property".

34.    This accusation, however, like the accusation regarding The Company Company, was blatantly false.  As Lipp's counsel explained by letter on July 25, 2025, the DocuMark repository implemented only widely known, publicly documented techniques, and included no Mixedbread source code, proprietary algorithms, or confidential materials.  Moreover, the repository's brief public status resulted from a GitHub settings oversight and was corrected immediately upon discovery.   It was never advertised, promoted or distributed in any way.

35.    Rather than respond to the July 25, 2025, letter, Mixedbread held a sham Board meeting to attempt to terminate Lipp *again*.  On August 6, 2025, Lipp received via email a notice from Shakir advising him that "the Mixedbread board of directors is having a special board meeting tomorrow morning, Thursday, 9am PST . . . [to discuss the] July 8, 2025 DocuMark files published by Julius Lipp, and whether to ratify J. Lipp's June 30, 2025, termination based [on the] July 8,

2025 DocuMark publication." The notice further stated, "Note: This invitation is being extended to Julius in case he is taking the position that he should still be on Mixedbread's Board of Directors. It is the Company position that he was validly removed following his June 30 termination. However, out of an abundance of caution, the Company is inviting him to attend this meeting."

36. Later that day, Lipp responded to Shakir that "[t]his meeting is clearly improper and is a transparent attempt to cover-up the wrongful actions taken against me" but that "[i]n any event, I will be attending the board meeting tomorrow with my counsel who are copied (please send my counsel the invite as well)."

37. On August 7, 2025, Lipp attended the spurious Board meeting, but Mixedbread barred his counsel from attending, despite that Mr. Benisek, who represented Mixedbread, Shakir, and Claussen, was permitted to attend. At the meeting, the Directors purported to terminate Mr. Lipp once again. Once more, they failed to present any evidence or facts supporting the purported termination, articulate anything resembling the requisite "Cause" under the Employment Agreement, or respond to Lipp's assertions that the allegations were blatantly untrue. The Board attempted to justify Lipp's second termination based on the DocuMark publication, but again, the accusations were untrue. These efforts by the Board were clearly an illicit attempt to fabricate a retroactive justification for Lipp's termination.

38. These actions by Mixedbread and its Board further substantiate that they acted unlawfully on June 30, 2025, and the preceding days, when they attempted to unlawfully terminate Lipp and steal Lipp Holding's equity. Indeed, Mixedbread, Benisek, and Shakir had sent Lipp numerous texts and emails after July 8, 2025 (the date they purportedly discovered the alleged DocuMark issue)—yet they only alerted Lipp to this purportedly serious issue concerning the DocuMark publication almost two weeks later (on July 21, 2025)—after they had received the above-discussed letter from Lipp's counsel. If their accusations against Lipp were true, and confidential and proprietary trade secrets had been published to the public, they would have promptly confronted Lipp about it. That they did not, is telling.

39. Having been wrongfully ousted from his executive position as CTO and Director of Mixedbread, and with Shakir and Claussen claiming the Company had halted the ongoing removal

of Lipp Holding's shares from the Repurchase Option, Lipp had no choice but to file the instant action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Employment Agreement)

### (By Plaintiff Julius Lipp against Defendant Mixedbread AI, Inc.)

40.     Plaintiffs re-allege and hereby incorporate by reference the preceding allegations as though fully set forth herein.

41.     On or about May 28, 2025, Lipp and Mixedbread entered into the written Employment Agreement, a copy of which is attached as Exhibit B and incorporated by this reference.

42.     Lipp has performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the Employment Agreement, except those that Mixedbread has improperly prevented him from performing through its invalid actions as described herein, such as by terminating him without justification.

43.     On or about June 30, 2025, Mixedbread breached the Employment Agreement by purporting to terminate Lipp from his employment with Mixedbread in violation of the terms of that Employment Agreement.  The Employment Agreement permits termination only "for Cause," and it provides further that:

> "Cause" shall mean the occurrence of any of the following: (1) Employee's continuous failure to substantially perform Employee's duties hereunder; (2) Employee's theft, fraud, dishonesty or breach of fiduciary duty as relates to the Company's business or property; (3) Employee's material failure to abide by applicable codes of conduct or policies or engagement in moral turpitude or conduct which is materially injurious to the Company monetarily or otherwise.

EA at ¶ 3.  At no time, however, has Lipp (1) engaged in any continuous failure to substantially perform his duties under the Employment Agreement; (2) engaged in any theft, fraud, dishonesty or breach of fiduciary duty as relates to the Company's business or property; or (3) engaged in an material failure to abide by applicable codes of conduct or policies or engagement in moral turpitude or conduct which is materially injurious to the Company monetarily or otherwise.   As such,

Mixedbread's purported termination of Lipp lacked the required "Cause" under EA ¶ 3, and so constituted a breach of the Employment Agreement.

44.     As a result of Mixedbread's breach of the Employment Agreement, Lipp has suffered damage in the nature of, among other things, the loss of his salary and benefits, in an amount according to proof at trial, but in no event less than $3,000,000.00.  Also as a direct consequence of Mixedbread's breach, Lipp has lost all the future benefits he would have received from his transformative work of architecting Mixedbread's core technology and successful implementation of its product strategy, in an amount according to proof at trial.

## SECOND CLAIM FOR RELIEF

### Breach of Contract

### (Restricted Stock Purchase Agreement)

### (By Plaintiff Julius Lipp Holding, UG, against Defendant Mixedbread AI, Inc.)

45.     Plaintiffs re-allege and hereby incorporate by reference the preceding allegations as though fully set forth herein.

46.     On or about October 26, 2023, the Company executed the RSPA with Lipp Holding, a copy of which is attached as Exhibit A and incorporated by this reference.  Pursuant to the RSPA, Lipp Holding purchased four million five hundred thousand (4,500,000) shares of the Company's common stock.  RSPA ¶ 1.

47.     Lipp Holding has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the RSPA, except those that Mixedbread has improperly prevented it from performing through its invalid actions.

48.     On or about June 30, 2025, Mixedbread breached the RSPA by purporting to terminate the continued release from the Repurchase Option of those shares owned by Lipp Holding that had not already vested.  As alleged *supra* at ¶ 30, the minutes of the June 30, 2025, Board meeting memorialize Mixedbread's position that "effective June 30, 2025, all vesting for Julius Lipp was ceased as a result of his termination as an employee and Service Provider."

49.     This purported termination of the continued vesting of the shares by Mixedbread is in breach of the RSPA for at least two reasons.  First, the ongoing release of Lipp Holdings' shares

from the Repurchase Option is not dependent on whether plaintiff Lipp, the individual, maintains a contract of employment with Mixedbread.  Second, under the clear terms of the RSPA as described *supra* at ¶ 19, Lipp Holdings will forever be a "Service Provider" not subject to termination under the RSPA.

50.     As a result of Mixedbread's breach of the RSPA, plaintiff Lipp Holding has suffered damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

**Conversion**

**(By Plaintiff Julius Lipp Holding, UG, against Defendant Mixedbread AI, Inc.)**

51.     Plaintiffs re-allege and hereby incorporate by reference the preceding allegations as though fully set forth herein.

52.     Lipp Holding held, and still holds, a property interest in all of the 4,500,000 shares it acquired through the RSPA.  By the time of the June 30, 2025, Board meeting alleged *supra* at ¶¶ 29-30, approximately 50% of the 4,500,000 shares Lipp Holding purchased under the RSPA (approximately 2,250,000), had already been released from the Repurchase Option under RSPA ¶ 3(a)(i).  The remaining approximately 2,250,000 shares, however, were also not subject to the Repurchase Option for the reasons alleged *supra* at ¶ 19—*i.e.*, because under the terms of the RSPA, Lipp Holding will forever be a "Service Provider" not subject to termination under the RSPA.

53.     Mixedbread converted Lipp Holding's interest in its Mixedbread shares to the Company's own use by, among other things:  making the claim that the purported termination of Lipp from Mixedbread would halt the release of the remaining approximately 2,250,000 shares from the Repurchase Option.

54.     As alleged *supra* at ¶ 19, Mixedbread has no legal right to claim that the purported termination of Lipp would halt the release of these shares from the Repurchase Option.

55.     As a result, Mixedbread has wrongfully exerted dominion and control over the property of Lipp Holding; and has acted in denial of, or inconsistent with, Lipp Holding's title or rights to that property, or in derogation, exclusion, or defiance of Lipp Holding's rights to its

property.

56.    Mixedbread has no right to assert control over plaintiff Lipp Holding's remaining approximately 2,250,000 shares, and such exertion of control is without legal justification.

57.    As a proximate result of defendant Mixedbread's conduct, plaintiff Lipp Holding has suffered damages in an amount to be determined at trial.

58.    These acts of Mixedbread were willful, intentional in nature and of a despicable character, evincing Mixedbread's callous and wanton disregard of Lipp Holding's rights, and were undertaken with the knowledge of probable injury to Lipp Holding.  Mixedbread acted with malice, fraud and/or oppression as defined in Civil Code § 3294.  Accordingly, Lipp Holding is entitled to recover punitive damages pursuant to Civil Code § 3294, in an amount according to proof at trial.

## FOURTH CLAIM FOR RELIEF

### Violation of California Penal Code § 496

### (By Plaintiff Julius Lipp Holding, UG, against Defendant Mixedbread AI, Inc.)

59.    Plaintiffs re-allege and hereby incorporate by reference the preceding allegations as though fully set forth herein.

60.    California Penal Code § 496, subdivision (a) states: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting *theft* or extortion, knowing the property to be so stolen or obtained …" is subject to imprisonment. Subdivision (c) permits any person injured by a violation of subdivision (a) to "bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

61.    California Penal Code § 484, subdivision (a) defines the act of "theft" under California Penal Code § 496 as including to "feloniously steal, take, carry, lead, or drive away the personal property of another…."

62.    Mixedbread, by asserting that the purported termination of Lipp caused the release of Lipp Holding's shares from the Repurchase Option to abate, did feloniously steal, take, carry, lead, or drive away the personal property of Lipp Holding, *i.e.*, the remaining approximately 2,250,000 shares that had not already been released from the Repurchase Option.

63.    Mixedbread, in making the claim that the purported termination of Lipp would halt the release of these shares from the Repurchase Option, intended to permanently deprive Lipp Holding of its ownership interest in these shares.

64.    As alleged *supra* at ¶ 19, Mixedbread had no legal right to claim that the purported termination of Lipp would halt the release of these shares from the Repurchase Option, and so lacked a good faith claim of right to the shares.

65.    At no time did Lipp Holding agree to or consent to Mixedbread's claim to its shares.

66.    As a proximate result of defendant Mixedbread's conduct, plaintiff Lipp Holding has suffered damages in an amount to be determined at trial, and is further entitled to treble damages, attorneys' fees, and costs.

## FIFTH CLAIM FOR RELIEF

### Declaratory Relief

**(By Plaintiff Julius Lipp Holding, UG, against Defendant Mixedbread AI, Inc.)**

67.    Plaintiffs re-allege and hereby incorporate by reference the preceding allegations as though fully set forth herein.

68.    Lipp Holding seeks a judicial declaration regarding the rights and duties between it and Mixedbread concerning Lipp Holding's share ownership under the RSPA.

69.    By the time of the June 30, 2025, Board meeting alleged *supra* at ¶¶ 29-30, approximately 50% of the 4,500,000 shares Lipp Holding purchased under the RSPA (approximately 2,250,000), had already been released from the Repurchase Option under RSPA ¶ 3(a)(i).  The remaining approximately 2,250,000 shares, however, were also not subject to the Repurchase Option for the reasons alleged *supra* at ¶ 19—*i.e.*, because under the terms of the RSPA, Lipp Holding will forever be a "Service Provider" not subject to termination under the RSPA.  Lipp Holding thus has an inviolable right to, and full ownership interest in, all of the 4,500,000 Mixedbread shares it purchased pursuant to the RSPA.

70.    Mixedbread, by, among other things, making the claim that the purported termination of Lipp from Mixedbread would halt the release of the remaining approximately 2,250,000 shares from the Repurchase Option, has spoken and acted as if Lipp Holding does not have any right to,

1    or ownership interest in, the remaining approximately 2,250,000 shares.

2        71.    Accordingly, based on the parties' divergent positions, Lipp Holding requires a

3    judicial declaration to clarify its rights and interests.

4                              **PRAYER FOR RELIEF**

5        WHEREFORE, Plaintiffs respectfully requests judgment and relief against Defendant as

6    follows:

7        A.    For judgment in favor of Plaintiffs and against Defendant;

8        B.    For compensatory damages in an amount to be proven at trial;

9        C.    For treble damages for Defendant's violation of California Penal Code § 496;

10       D.    For punitive and exemplary damages;

11       E.    For attorneys' fees and costs, as provided by law;

12       F.    For pre- and post-judgment interest;

13       G.    For a declaration that:

14           a.  Plaintiff Lipp Holding is the rightful owner of the 4,500,000 Mixedbread shares it

15               purchased under the RSPA;

16           b.  None of the 4,500,000 Mixedbread shares Lipp Holding purchased under the RSPA

17               is subject to the Repurchase Option;

18           c.  The Mixedbread shares Lipp Holding acquired under the RSPA have continued to

19               vest according to the Vesting Schedule and be released from the Repurchase Option

20               unabated since June 1, 2023, pursuant to RSPA ¶ 3.(a)(i); and

21       H.    For any other relief that the Court deems just and proper.

22

23   Dated: September 29, 2025                 TUFFAHA CHENNAKESAVAN
24                                            MANDLEKAR LLP

25                                            By.:   _/s/ Prashanth Chennakesavan_
26                                                  Prashanth Chennakesavan
27                                                  *Counsel for Plaintiffs Julius Lipp and*
                                                   *Julius Lipp Holding, UG*
28

1

## **<u>DEMAND FOR JURY TRIAL</u>**

2       Plaintiffs Julius Lipp and Julius Lipp Holding, UG, hereby demand a trial by jury, on all

3   issues so triable.

4

5    Dated: September 29, 2025                    TUFFAHA CHENNAKESAVAN
                                                  MANDLEKAR LLP
6

7                                                 By.:   _/s/ Prashanth Chennakesavan_
                                                         Prashanth Chennakesavan
8                                                        *Counsel for Plaintiffs Julius Lipp and*
                                                         *Julius Lipp Holding, UG*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

## RESTRICTED STOCK PURCHASE AGREEMENT

This Restricted Stock Purchase Agreement (this "Agreement") is made as of October 26, 2023, by and between mixedbread ai, inc., a Delaware corporation (the "Company") and Julius Lipp Holding UG (haftungsbeschränkt), a German limited liability company ("Purchaser").

1.     Sale of Stock. Subject to the terms and conditions of this Agreement, the Company will issue and sell to Purchaser, and Purchaser agrees to purchase from the Company, **Four Million Five Hundred Thousand (4,500,000)** shares of the Company's common stock (the "Shares") at a purchase price of $0.00001 per share for a total purchase price of $45.00 (the "Aggregate Purchase Price"). The closing of the transactions contemplated by this Agreement, including payment for and delivery of the Shares, shall occur at the offices of the Company immediately following the execution of this Agreement, or at such other time and place as the parties may mutually agree (the "Purchase Date"). As used elsewhere herein, the term "Shares" refers to all of the Shares purchased hereunder and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.     Purchase. The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution and delivery of this Agreement, the payment of the Aggregate Purchase Price by check or wire transfer, and the satisfaction of any applicable tax, withholding obligations, required deductions or other payments. The Company shall issue the Shares to Purchaser by entering such Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company, against payment of the purchase price therefor by Purchaser. If applicable, the Company will deliver to Purchaser a certificate representing the Shares as soon as practicable following such date.

3.     Limitations on Transfer. In addition to any other limitation on transfer created by the transfer restrictions set forth in the Company's Bylaws or by applicable laws, Purchaser shall not assign, encumber or dispose of any interest in the Shares except to the extent permitted by, and in compliance with the provisions below and applicable laws.

(a)     Repurchase Option; Vesting.

(i)     One Hundred Percent (100%) of the Shares shall initially be subject to the Repurchase Option (the "Vesting Shares"). One-forty-eighth (1/48th) (or approximately 93,750 shares) of the Vesting Shares shall be released from the Repurchase Option each month on the same day of the month as the Vesting Commencement Date (and if there is no corresponding day, on the last day of the month), until all Vesting Shares are released from the Repurchase Option; provided, however, that such scheduled releases from the Repurchase Option shall immediately cease as of the Termination Date. Fractional shares shall be rounded to the nearest whole share. The Vesting Commencement Date shall be June 1, 2023.

(ii)     Notwithstanding the foregoing, if a Change in Control occurs, the vesting of the Unvested Shares shall accelerate such that this Repurchase Option shall lapse as to one hundred percent (100%) of the Unvested Shares, effective as of immediately prior to consummation of the Change of Control. The lapse of repurchase rights provided for in the previous sentence shall occur immediately prior to such Change in Control.

(iii)     In the event of the voluntary or involuntary termination of Purchaser's status as a Service Provider for any reason (including death or Disability), with or without cause, the Company shall upon the date of such termination (the "Termination Date") have an irrevocable, exclusive

option (the "Repurchase Option") for a period of ninety (90) days from such date to repurchase all or any portion of the Unvested Shares (as defined below) held by Purchaser as of the Termination Date at the original purchase price per Share (adjusted for any stock splits, stock dividends and the like) specified in Section 1. As used in this Agreement, "Unvested Shares" means Shares that have not yet been released from the Repurchase Option. "Disability" means total and permanent disability as defined in Code Section 22(e)(3), and "Service Provider" means any person or entity, including an advisor, who renders, or has rendered, services to the Company.

(iv)      Unless the Company notifies Purchaser within ninety (90) days from the Termination Date that it does not intend to exercise its Repurchase Option with respect to some or all of the Unvested Shares, the Repurchase Option shall be deemed automatically exercised by the Company as of the end of such ninety (90)-day period following such Termination Date; provided, that the Company may notify Purchaser that it is exercising its Repurchase Option as of a date prior to the end of such ninety (90)-day period. Unless Purchaser is otherwise notified by the Company pursuant to the preceding sentence that the Company does not intend to exercise its Repurchase Option as to some or all of the Unvested Shares to which it applies at the time of termination, execution of this Agreement by Purchaser constitutes written notice to Purchaser of the Company's intention to exercise its Repurchase Option with respect to all Unvested Shares to which such Repurchase Option applies. The Company, at its choice, may satisfy its payment obligation to Purchaser with respect to exercise of the Repurchase Option by either (A) delivering a check to Purchaser in the amount of the purchase price for the Unvested Shares being repurchased, or (B) in the event Purchaser is indebted to the Company, canceling an amount of such indebtedness equal to the purchase price for the Unvested Shares being repurchased, or (C) by a combination of (A) and (B) so that the combined payment and cancellation of indebtedness equals such purchase price. In the event of any deemed automatic exercise of the Repurchase Option pursuant to this Section 3(a)(iv) in which Purchaser is indebted to the Company, such indebtedness equal to the purchase price of the Unvested Shares being repurchased shall be deemed automatically canceled as of the end of the ninety (90)-day period following the Termination Date unless the Company otherwise satisfies its payment obligations. As a result of any repurchase of Unvested Shares pursuant to this Section 3(a), the Company shall become the legal and beneficial owner of the Unvested Shares being repurchased and shall have all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Unvested Shares being repurchased by the Company, without further action by Purchaser.

(v)      For purposes of this Agreement, "Change in Control" means (1) a change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("Person"), acquires ownership of the stock of the Company that, together with the stock held by such Person, constitutes more than 50% of the total voting power of the stock of the Company, except that any change in the ownership of the stock of the Company as a result of a private financing of the Company that is approved by the Board will not be considered a Change in Control;  or (2) if the Company has a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), a change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election. For purposes of this clause (2), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered a Change in Control; or (3) a change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than 50% of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions. For purposes of this subsection (3), gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such

assets. For purposes of this <u>Section 3(a)(v)</u>, persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company. Notwithstanding the foregoing, a transaction will not be deemed a Change in Control unless the transaction qualifies as a change in control event within the meaning of Internal Revenue Code of 1986, as amended (the "<u>Code</u>") Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been promulgated or may be promulgated thereunder from time to time. Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (A) its sole purpose is to change the jurisdiction of the Company's incorporation, or (B) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

(b)     <u>Right of First Refusal</u>. Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "<u>Holder</u>") may be sold or otherwise transferred (including transfer by gift or operation of law), the Holder must provide the Company or its assignee(s) with a right of first refusal to purchase the Shares on the terms and conditions set forth in this <u>Section 3(b)</u> (the "<u>Right of First Refusal</u>") and the Company shall have the right to approve such transfer, in its sole and absolute discretion. If the Holder would like to transfer any Shares the Company may either (1) exercise its Right of First Refusal and purchase the Shares as forth in this <u>Section 3(b),</u> (2) reject to exercise its Right of First Refusal and permit the transfer of the Shares to the Proposed Transferee (as defined below), or (3) reject to exercise its Right of First Refusal and reject any transfer of the Shares.

(i)     <u>Notice of Proposed Transfer</u>. The Holder of the Shares shall deliver to the Company a written notice (the "<u>Notice</u>") stating: (A) the Holder's intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("<u>Proposed Transferee</u>"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "<u>Transfer Purchase Price</u>"). The Holder shall offer the Shares at the Transfer Purchase Price and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii)     <u>Exercise of Right of First Refusal</u>. At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase any or all of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the Transfer Purchase Price; <u>provided</u> that if the Transfer Purchase Price consists of no legal consideration (as, for example, in the case of a transfer by gift), the purchase price will be the fair market value of the Shares as determined in good faith by the Company. If the Transfer Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Company in good faith.

(iii)     <u>Payment</u>. Payment of the Transfer Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness or by any combination thereof within sixty (60) days after receipt of the Notice or in the manner and at the times mutually agreed to by the Company (or its assignee(s)) and the Holder.

(iv)     <u>Holder's Right to Transfer</u>. If any of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are both (A) not purchased by the Company and/or its assignee(s) as provided in this <u>Section 3(b)</u> <u>and</u> (B) approved by the Company to be transferred, then the Holder may sell or otherwise transfer any unpurchased Shares to the Proposed Transferee at the Transfer Purchase Price or at a higher price; <u>provided</u> that such sale or other transfer is consummated within 120 days after the date of the Notice and; <u>provided</u>, <u>further</u>, that any such sale or other transfer is effected in accordance with the transfer restrictions set forth in the Company's Bylaws and any Applicable Laws and

the Proposed Transferee agrees in writing that the provisions of this <u>Section 3</u> shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may require the Holder to provide an opinion of counsel evidencing compliance with Applicable Laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again have the right to approve such transfer and be offered the Right of First Refusal.

(v)    <u>Exception for Certain Family Transfers</u>. Anything to the contrary contained in this <u>Section 3</u> notwithstanding, the transfer of any or all of the Shares during Purchaser's lifetime or on Purchaser's death by will or intestacy to Purchaser's Immediate Family or to a trust for the benefit of Purchaser or Purchaser's Immediate Family shall be exempt from the provisions of this <u>Section 3</u>. "<u>Immediate Family</u>" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships. In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this <u>Section 3</u>, and there shall be no further transfer of such Shares except in accordance with the terms of this <u>Section 3</u>.

(c)    <u>Company's Right to Purchase upon Involuntary Transfer</u>. In the event, at any time after the date of this Agreement, of any transfer by operation of law or other involuntary transfer (including death or divorce, but excluding a transfer to Immediate Family as set forth in <u>Section 3(b)(v) above</u>) of all or a portion of the Shares by the record holder thereof, the Company shall have the right to purchase any or all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the Fair Market Value of the Shares on the date of transfer (as determined by the Company in its sole discretion). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of thirty (30) days following receipt by the Company of written notice from the Holder. "<u>Fair Market Value</u>" means as of any date, the value of common stock determined as follows: (i) if the common stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq Global Select Market, the Nasdaq Global Market or the Nasdaq Capital Market of The Nasdaq Stock Market, its Fair Market Value will be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the day of determination, as reported in *The Wall Street Journal* or such other source as the Board deems reliable; (ii) if the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share will be the mean between the high bid and low asked prices for the common stock on the day of determination (or, if no bids and asks were reported on that date, as applicable, on the last trading date such bids and asks were reported), as reported in *The Wall Street Journal* or such other source as the Board deems reliable; or (iii) in the absence of an established market for the Common Stock, the Fair Market Value will be determined in good faith by the Board.

(d)    <u>Assignment</u>. The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(e)    <u>Restrictions Binding on Transferees</u>. All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement, including, without limitation and insofar as applicable, the Repurchase Option. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(f)    <u>Termination of Rights</u>. The transfer restrictions set forth in <u>Section 3</u> shall terminate upon (i) the first sale of common stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act (other than a registration statement relating solely to the issuance of common stock pursuant to a business combination or an employee incentive or benefit plan) or (ii) any transfer or conversion of Shares made pursuant to a statutory merger or statutory consolidation of the Company with or into another corporation or corporations if the common stock of the surviving corporation or any direct or indirect parent corporation thereof is registered under the Exchange Act. Upon termination of such transfer restrictions, the Company will remove any stop-transfer notices referred to in <u>Section 5b</u> and related to the restriction in this <u>Section 3</u> and, if certificates are issued, a new certificate or certificates representing the Shares not repurchased shall be issued, on request, without the legend referred to in <u>Section 5(a)(i)</u> below.

4.    <u>Investment and Taxation Representations</u>. In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a)    Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares.  Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "<u>Securities Act</u>").

(b)    Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)    Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities. Purchaser understands that the certificate evidencing the Shares will be imprinted with a legend that prohibits the transfer of the Shares unless the Shares are registered or such registration is not required in the opinion of counsel for the Company.

(d)    Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act as in effect from time to time, that, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions.

(e)    Purchaser further understands that at the time Purchaser wishes to sell the Shares there may be no public market upon which to make such a sale, and that, even if such a public market then exists, the Company may not be satisfying the current public information requirements of Rule 144, and that, in such event, Purchaser may be precluded from selling the Shares under Rule 144 even if the minimum holding period requirement had been satisfied.

(f)    Purchaser further warrants and represents that Purchaser has either (i) preexisting personal or business relationships, with the Company or any of its officers, directors or controlling persons, or (ii) the capacity to protect Purchaser's own interests in connection with the purchase of the Shares by virtue of the business or financial expertise of Purchaser or of professional advisors to Purchaser who are unaffiliated with and who are not compensated by the Company or any of its affiliates, directly or indirectly.

(g)    Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

(h)    Purchaser represents that Purchaser is not subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

(i)    If the Purchaser is not a United States person (as defined by Section 7701(a)(30) of the Code, the Purchaser has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Purchaser's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Purchaser's jurisdiction.

5.    Restrictive Legends and Stop-Transfer Orders.

(a)    Legends. All certificates representing the Shares shall have endorsed thereon legends in substantially the following forms (in addition to any other legend which may be required by other agreements between the parties to this Agreement):

(i)    "THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO THE SECURITIES UNDER SAID ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED."

(ii)    "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF THE COMPANY AND/OR ITS ASSIGNEE(S) AS PROVIDED IN THE BYLAWS OF THE COMPANY."

(iii)    Any legend required by appropriate blue sky officials.

(b)    Stop-Transfer Notices. Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    Refusal to Transfer. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

(d)    Required Notices. Purchaser acknowledges that the Shares are issued and shall be held subject to all the provisions of this Section 5, the Articles of Incorporation and the Bylaws of the

Company and any amendments thereto, copies of which are on file at the principal office of the Company. A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Company and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Company, and the Company will furnish any stockholder, upon request and without charge, a copy of such statement. Purchaser acknowledges that the provisions of this <u>Section 5</u> shall constitute the notices required by Applicable Laws and the Purchaser hereby expressly waives the requirement of Applicable Laws that it receive the written notice within a reasonable time after the issuance of the Shares.

6.    <u>No Employment Rights</u>. Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.    <u>Lock-Up Agreement</u>. If so requested by the Company or the underwriters in connection with the initial public offering of the Company's securities registered under the Securities Act of 1933, as amended, Purchaser shall not sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (except for those being registered) without the prior written consent of the Company or such underwriters, as the case may be, for 180 days from the effective date of the registration statement, plus such additional period, to the extent required by FINRA rules, up to a maximum of 216 days from the effective date of the registration statement, and Purchaser shall execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of such offering.

8.    <u>Miscellaneous</u>.

(a)    <u>Governing Law</u>. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

(b)    <u>Entire Agreement; Enforcement of Rights</u>. This Agreement (including the exhibits referenced herein) set forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior or contemporaneous discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c)    <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d)    <u>Electronic Delivery</u>. The Company may, in its sole discretion, decide to deliver any documents related to this Agreement or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Purchaser hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery

and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(e)     Notices. Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email or fax (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address or fax number as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records. Any notice to the Escrow Holder shall be sent to the Company's address with a copy to the other party not sending the notice.

(f)     Construction. This Agreement is the result of negotiations between and has been reviewed by each of the parties hereto and their respective counsel, if any; accordingly, this Agreement shall be deemed to be the product of all of the parties hereto, and no ambiguity shall be construed in favor of or against any one of the parties hereto.

(g)     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. Execution of a facsimile copy will have the same force and effect as execution of an original, and a facsimile signature will be deemed an original and valid signature.

(h)     Successors and Assigns. Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

(i)     Imposition of Other Requirements. Purchaser agrees to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, Purchaser acknowledges that the laws of the country in which Purchaser is working at the time of grant of this Agreement, the purchase, vesting or sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject Purchaser to additional procedural or regulatory requirements that Purchaser is and will be solely responsible for and must fulfill.

(j)     California Corporate Securities Law. THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF BUSINESS OVERSIGHT OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

*[Signature Page Follows]*

Purchaser has reviewed this Agreement in its entirety, has had an opportunity to obtain the advice of counsel prior to executing this Agreement and fully understands all provisions of this Agreement. Purchaser further agrees to notify the Company upon any change in the residence address indicated below.

**COMPANY:**

mixedbread ai, inc.

By: _Aamir Shakir_
565EFF180D8F455...
(Signature)

Name: _Aamir Shakir_
Title: _CEO_

**PURCHASER:**

JULIUS        LIPP        HOLDING        UG (HAFTUNGSBESCHRÄNKT)

By: _Lipp_
F6CE9043910E436...
Julius Lipp, Its Manager

Email: _lipp.julius@gmail.com_

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

    (A) In connection with the purchase or sale of any security;

    (B) Involving the making of any false filing with the Commission; or

    (C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

    (A) At the time of such sale, bars the person from:

        (1) Association with an entity regulated by such commission, authority, agency, or officer;

        (2) Engaging in the business of securities, insurance or banking; or

        (3) Engaging in savings association or credit union activities; or

    (B) Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv) Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

    (A) Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

    (B) Places limitations on the activities, functions or operations of such person; or

    (C)Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v) Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

    (A) Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

    (B) Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii) Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

Exhibit B

# EMPLOYMENT AGREEMENT

Mixedbread ai, inc., a Delaware corporation (the "Company"), on the one hand, and Julius Lipp ("Employee"), on the other hand (individually, a "Party", and collectively, the "Parties") agree to enter into this employment agreement ("Agreement") as of May _28th_____, 2025 (the "Effective Date") pursuant to the following material terms:

1.      <u>Employment, Duties and Acceptance</u>.  All of Employee's powers and authority in any capacity shall at all times be subject to the direction and control of the Company's Board of Directors.  The Board may assign to Employee such management and supervisory responsibilities and Employee duties for the Company or any subsidiary of the Company, including serving as an Employee officer and/or director of any subsidiary.  The Company and Employee acknowledge that Employee's primary functions and duties as Chief Technology Officer are set forth in **Exhibit A**.

2.      <u>Compensation and Benefits</u>.

2.1     <u>Salary</u>.  The Company shall pay to Employee a salary ("Base Salary") at the annual rate of $100,000.  Employee's compensation shall be paid in equal, periodic installments in accordance with the Company's normal payroll procedures.

2.2     <u>Benefits</u>.  Employee shall be entitled to such medical, life, disability and other benefits as are generally afforded to other Employees of the Company, subject to applicable waiting periods and other conditions.

2.3     <u>Vacation</u>.  Employee shall be entitled to such paid vacation days in each year during the Term and to a reasonable number of other days off for religious and personal reasons in accordance with customary Company policy.

2.4     <u>Expenses</u>.  The Company shall pay or reimburse Employee for all transportation, hotel and other expenses reasonably incurred by Employee on business trips and for all other ordinary and reasonable out-of-pocket expenses actually incurred by him in the conduct of the business of the Company against itemized vouchers submitted with respect to any such expenses and approved in accordance with customary procedures.

3.    <u>Termination</u>. Employee may terminate his employment upon 60 days prior written notice to the Company.  Employer may terminate Employee for Cause at any time. For "Cause" shall mean the occurrence of any of the following: (1) Employee's continuous failure to substantially perform Employee's duties hereunder; (2) Employee's theft, fraud, dishonesty or breach of fiduciary duty as relates to the Company's business or property; (3) Employee's material failure to abide by applicable codes of conduct or policies or engagement in moral turpitude or conduct which is materially injurious to the Company monetarily or otherwise.

4.    <u>Non-Competition</u>.  During Employee's employment with the Company and for a period of one year from the date Employee's employment relationship with the Company has terminated (the "<u>Restricted Period</u>"), Employee agrees not to, and not to prepare to, directly or indirectly, without express written consent from Company, (i) own, set up, control, manage, operate, participate in, have a financial or beneficial interest in, be employed by, or provide any type of service to any business or entity that is a Competing Business (including as principal, sole proprietor, partner, member, employee, independent contractor, consultant, advisor, officer, director, stockholder, investor, or in any other capacity) in the Business Area, (ii) induce or attempt to induce any existing (as of the Effective Date) customer, supplier, independent contractor, consultant, vendor, joint venture, investor or other business relation of the Company to provide business or services to Employee (or through Employee to any other Person), in each case in a manner in which would negatively affect any commercial relationship of the Company, or to cease doing business in whole or in part with the Company or (iii) interfere with any business relationship between the Company and any third party (including any customer, supplier, independent contractor, consultant, vendor, joint venture, investor or any other business relationship). Notwithstanding the foregoing, Employee is permitted to passively invest in companies in the artificial intelligence industry that do not compete with any Company current or future product or service. "<u>Business Area</u>" shall mean any countries worldwide in which the Company directly or indirectly conducts, or plans to conduct, any aspect of the Company's business as of the Effective Date." <u>Competing Business</u>" shall mean any Person engaged in the research, development or provision of products or services that compete with the business of the Company as of the Effective Date, including the research, development or provision of (i) advanced search and retrieval solutions powered by artificial intelligence and  (ii) all other capabilities related to all products and services referenced in clause (i). Notwithstanding the foregoing, Employee may own, directly or indirectly, solely as a passive investment, up to 1% of

any class of securities of any publicly traded company, whether or not such company is a Competing Business.

     5.    <u>Confidentiality</u>.

     5.1    <u>Protection of Information.</u>  Employee understands that during his/her employment with the Company, the Company intends to provide Employee with information, including Confidential Information (as defined below), without which Employee would not be able to perform Employee's duties to the Company.  Employee agrees, at all times during the term of employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform Employee's obligations to the Company, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that Employee obtains, accesses or creates during the employment, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of Employee's or of others who were under confidentiality obligations as to the item or items involved.  Employee further agree not to make copies of such Confidential Information except as authorized by the Company.

     5.2    <u>Confidential Information</u>.  Employee understands that "<u>Confidential Information</u>" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties.  Confidential Information includes, without limitation:  (i) Company Inventions (as defined below); (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom Employee called or with whom Employee became acquainted during the employment period), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business

information disclosed to Employee by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

    6.    <u>Miscellaneous Provisions</u>.

    6.1    <u>Notices</u>.  All notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when (i) delivered personally to the Party to receive the same, or (ii) when mailed first class postage prepaid, by certified mail, return receipt requested, addressed to the Party to receive the same at his or its address.  All notices shall be deemed to have been given as of the date of personal delivery or mailing thereof.

    6.2    <u>Entire Agreement; Waiver</u>.  This Agreement sets forth the entire agreement of the parties relating to the employment of Employee and is intended to supersede all prior negotiations, understandings and agreements.  No provisions of this Agreement may be waived or changed except by a writing by the party against whom such waiver or change is sought to be enforced.  The failure of any party to require performance of any provision hereof or thereof shall in no manner affect the right at a later time to enforce such provision.

    6.3    <u>Governing Law</u>.  All questions with respect to the construction of this Agreement, and the rights and obligations of the parties hereunder, shall be determined in accordance with the law of the State of Delaware applicable to agreements made and to be performed entirely in Delaware.

    6.4    <u>Binding Effect; Nonassignability</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the Company.  This Agreement shall not be assignable by Employee but shall inure to the benefit of and be binding upon Employee's heirs and legal representatives.

    6.5    <u>Severability</u>.  Should any provision of this Agreement become legally unenforceable, no other provision of this Agreement shall be affected, and this Agreement shall continue as if the Agreement had been executed absent the unenforceable provision.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

The Company

By: _Eric Benisek_____
2B0D0058BF7D4C3...

Eric Benisek, Secretary

Email: ebenisek@vbllaw.com

Employee

By: _____
FFF2E178C47049D...

Julius Lipp

Address: Heinkenborsteler Str. 15
24613 Aukurg Schleswig-Holstein
Germany

Email: julius@mixedbread.ai

Docusign Envelope ID: E4AA31DC-5F99-4445-A8B2-6AF28F45B920

## **EXHIBIT A**

Employee shall be responsible for, among other things, developing and executing the Company's technology strategy, overseeing product development and IT operations and leading technical teams.